# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NORMAND C. FISKE, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 11-1148 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | Judge Mark R. Hornak |
| COMMISSIONER OF SOCIAL | ) | Magistrate Judge Maureen P. Kelly |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

### I.  INTRODUCTION

Plaintiff Normade C. Fiske, Jr. ("Fiske"), brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  The matter is presently before the Court on cross-motions for summary judgment filed by the parties pursuant to Federal Rule of Civil Procedure 56.  (ECF Nos. 10 & 13).  For the reasons that follow, it is respectfully recommended that the Commissioner's decision be vacated, and that the case be remanded to him for further consideration of Fiske's claims.

### II.  PROCEDURAL HISTORY

Fiske protectively applied for DIB and SSI benefits on March 18, 2009, alleging that he had become "disabled" on May 1, 2006.  (R. at 130, 132, 158).  Pennsylvania's Bureau of Disability Determination denied the applications on August 14, 2009.  (R. at 58, 64, 70, 76).

Fiske responded on September 21, 2009, by filing a timely request for an administrative hearing. (R. at 82-83). On October 14, 2010, a hearing was held in Seven Fields, Pennsylvania, before Administrative Law Judge ("ALJ") Douglas Cohen. (R. at 23). Fiske, who was represented by counsel, appeared and testified at the hearing. (R. at 26-45). Dr. Fred A. Monaco, an impartial vocational expert, also testified at the hearing. (R. at 45-49). In a decision dated December 3, 2010, the ALJ determined that Fiske was not "disabled" within the meaning of the Act. (R. at 8-19).

On February 1, 2011, Fiske sought administrative review of the ALJ's decision by filing a request for review with the Appeals Council. (R. at 7, 217-224). The Appeals Council denied the request for review on August 10, 2011, thereby making the ALJ's decision the "final decision" of the Commissioner in this case. (R. at 1). Fiske commenced this action on September 10, 2011, seeking judicial review of the Commissioner's decision. (ECF Nos. 1 & 3). Fiske and the Commissioner filed motions for summary judgment on March 13, 2012, and April 20, 2012, respectively. (ECF Nos. 10 & 13). These motions are the subject of this Report and Recommendation, which is being filed pursuant to 28 U.S.C. § 636(b)(1)(C).

## III.    STANDARD OF REVIEW

This Court's review is plenary with respect to all questions of law. *Schaudeck v. Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate

explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d

955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated

rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose

of determining whether a claimant is "disabled" within the meaning of the Act. The United

States Supreme Court recently summarized this process by stating as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will
> not review the claim further. At the first step, the agency will find non-disability
> unless the claimant shows that he is not working at a "substantial gainful
> activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find
> non-disability unless the claimant shows that he has a "severe impairment,"
> defined as "any impairment or combination of impairments which significantly
> limits [the claimant's] physical or mental ability to do basic work activities." §§
> 404.1520(c), 416.920(c). At step three, the agency determines whether the
> impairment which enabled the claimant to survive step two is on the list of
> impairments presumed severe enough to render one disabled; if so, the claimant
> qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the
> list, the inquiry proceeds to step four, at which the SSA assesses whether the
> claimant can do his previous work; unless he shows that he cannot, he is
> determined not to be disabled. If the claimant survives the fourth stage, the fifth,
> and final, step requires the SSA to consider so-called "vocational factors" (the
> claimant's age, education, and past work experience), and to determine whether
> the claimant is capable of performing other jobs existing in significant numbers in
> the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes

omitted). Factual findings pertaining to all steps of the sequential evaluation process are subject

to judicial review under the "substantial evidence" standard. *McCrea v. Commissioner of Social*

*Security*, 370 F.3d 357, 360-361 (3d Cir. 2004).

In an action in which review of an administrative determination is sought, the agency's

decision cannot be affirmed on a ground other than that actually relied upon by the agency in

making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67

S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D.Pa. 2005).

## IV. THE DECISION OF THE ALJ

In his decision, the ALJ determined that Fiske had not engaged in substantial gainful activity subsequent to his alleged onset date. (R. at 13). Fiske was found to be suffering from schizoaffective disorder, bipolar disorder, adjustment disorder and marijuana abuse. (R. at 13). These impairments were all deemed to be "severe" under the Commissioner's regulations. (R. at 13); 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c). The ALJ concluded that Fiske's impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-15).

In accordance with 20 C.F.R. §§ 404.1545 and 416.945, the ALJ assessed Fiske's "residual functional capacity"[1] as follows:

---

[1] The term "residual functional capacity" is defined as "that which an individual is still able to do despite the limitations caused by his or her impairments." *Hartranft v. Apfel*, 181 F.3d 358, 359, n. 1 (3d Cir. 1999)(parentheses omitted), citing 20 C.F.R. § 404.1545(a). The same residual functional capacity assessment is used at the fourth and fifth steps of the sequential evaluation process. 20 C.F.R. §§ 404.1545(a)(5)(i)-(ii), 416.945(a)(5)(i)-(ii).

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant is limited to simple, routine, repetitive tasks, that are not performed in a fast-paced production environment, and which involve only simple, work-related decisions, and in general, relatively few work place changes; the claimant is limited to occupations which do not involve high levels of stress, such as occupations requiring independent decision making; the claimant should have no more than superficial interaction with supervisors and coworkers and no interaction with members of the general public.

(R. at 15). Fiske had "past relevant work"[2] experience as an assembly line worker, a preparation cook, a cook, and a kitchen manager. (R. at 45-46). In response to a hypothetical question describing an individual with the limitations contained in the ALJ's residual functional capacity assessment, Dr. Monaco testified that such an individual could not perform the duties of Fiske's prior jobs. (R. at 47). Consequently, it was determined that Fiske could not return to his past relevant work. (R. at 17).

Fiske was born on September 12, 1962, making him forty-three years old on his alleged onset date and forty-eight years old on the date of the ALJ's decision. (R. at 17, 130, 132). He was classified as a "younger person" under the Commissioner's regulations.[3] 20 C.F.R. §§ 404.1563(c), 416.963(c). He had a high school education[4] and an ability to communicate in English. (R. at 18, 26, 162, 168); 20 C.F.R. §§ 404.1564(b)(4)-(5), 416.964(b)(4)-(5). Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that Fiske could work as a document preparer, bench assembler or cleaner. (R. at 18). Dr. Monaco's

---

[2] "Past relevant work" is defined as "substantial gainful activity" performed by a claimant within the last fifteen years that lasted long enough for him or her to learn how to do it. 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). The Commissioner has promulgated comprehensive regulations governing the determination as to whether a claimant's work activity constitutes "substantial gainful activity." 20 C.F.R. §§ 404.1571-404.1576, 416.971-416.976.
[3] The regulations recognize that "younger persons" between the ages of forty-five and forty-nine are more limited in their ability to adjust to other work than are persons who have not yet attained the age of forty-five. 20 C.F.R. §§ 404.1563(c), 416.963(c).
[4] Fiske completed the twelfth grade in 1980. (R. at 26, 168).

testimony established that these jobs existed in the national economy for purposes of 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).[5]  (R. at 47-48).

## V.    DISCUSSION

Fiske last worked as a cook on April 30, 2006.  (R. at 163).  When he applied for DIB and SSI benefits, Fiske claimed that his interactions with other employees had caused him to "not show up for work," lose his temper and increase his "drug and alcohol intake."  (R. at 163). At the hearing, he testified that he had been "laid off."  (R. at 26).  Fiske's alleged onset date of May 1, 2006, coincides with the day following his last day of work.  (R. at 163).

Between July 2006 and July 2008, Fiske was incarcerated at Pennsylvania's State Correctional Institution in Cresson, Pennsylvania.  (R. at 28).  He testified that he had been convicted of manufacturing methamphetamines.  (R. at 28).  Under the Commissioner's regulations, Fiske was not eligible to receive DIB and SSI benefits during the course of his incarceration.  20 C.F.R. §§ 404.468(a), 416.211(a).

On July 14, 2009, Dr. Suzanne Houk performed a consultative psychological evaluation of Fiske in connection with his applications for DIB and SSI benefits.  (R. at 262-268).  During the evaluation, Fiske stated that he had been smoking marijuana on a daily basis.  (R. at 264). He described instances in which counselors and psychiatrists had refused to see him because of his refusal to stop using marijuana.  (R. at 265).  Fiske also discussed his "recent dreams" about "sexually controlling people."  (R. at 267).  Dr. Houk described Fiske's prognosis as "highly guarded" and recommended that he "participate in comprehensive mental health and substance abuse treatments."  (R. at 267).  Based on the findings of her evaluation, Dr. Houk reported that

---

[5] At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy."  *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003).  This burden is commonly satisfied by means of vocational expert testimony.  *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

Fiske had "moderate" to "marked" limitations in his abilities to interact appropriately with supervisors, interact appropriately with co-workers, and respond appropriately to work pressures in a usual work setting. (R. at 262). She indicated that he had "moderate" limitations in his abilities to understand and remember detailed instructions, carry out detailed instructions, and make judgments concerning simple work-related decisions. (R. at 262). Only "slight" limitations were found in Fiske's abilities to understand and remember short, simple instructions, carry out short, simple instructions, interact appropriately with members of the general public, and respond appropriately to changes in a routine work setting. (R. at 262).

Dr. Lisa Cannon, a non-examining psychological consultant, opined on August 12, 2009, that Fiske was capable of maintaining a full-time job. (R. at 273). In her consultative report, Dr. Cannon made the following statements about Fiske's work-related abilities and limitations:

> The claimant's basic memory processes are intact. He can make simple decisions. He is able to carry out very short and simple instructions. He is able to maintain concentration and attention for extended periods of time. Moreover, he is self-sufficient. He can sustain an ordinary routine without special supervision. The limitations resulting from the impairment do not preclude the claimant from performing the basic mental demands of competitive work on a sustained basis. There are no restrictions in his abilities in regards to understanding and memory and adaptation.

(R. at 273). Dr. Cannon found Dr. Houk's opinion to be "without substantial support from the other evidence of record." (R. at 273).

In August 2009, Fiske started to attend counseling sessions at Paoletta Counseling Services ("Paoletta"). His treating therapist was Cheryl Wild ("Wild"). (R. at 31, 518, 520). During a counseling session with Wild conducted on August 13, 2009, Fiske "endorsed fantasies of power, success, and sexual control over young women." (R. at 519). Describing Fiske as "a complex and very troubled individual," Wild stated that "[h]is addiction to marijuana [wa]s a

primary source of his many problems."  (R. at 519).  She observed that "[i]t would be interesting to see what he would be like without the daily marijuana intake."  (R. at 519).

On October 1, 2009, Fiske was voluntarily admitted to the Sharon Regional Health System ("Sharon") for inpatient psychiatric treatment.[6]  (R. at 351-354).  Laboratory testing revealed that he was actively using marijuana.  (R. at 353).  At the time of his admission, Fiske expressed "a strong desire to torture people," especially women between the ages of sixteen and twenty-five.  (R. at 351).  He stated that only "the law and his conscience" had prevented him from "cutting [women] into pieces."  (R. at 351).  His treating psychiatrist, Dr. Wally Novero, observed that Fiske was "obsessed about dominating young females."  (R. at 351).  Ironically, Fiske also exhibited a "tend[ency] to want to hurt people who hurt women and children."  (R. at 351).  After obtaining more information about Fiske's mental condition, his treating healthcare providers expressed a concern that he wanted to hurt President Barack Obama.  (R. at 352).  Since Fiske denied having such an intention, Dr. Novero determined that there was no need for the attending medical personnel to contact the Federal Bureau of Investigation or the United States Secret Service.  (R. at 353).  Fiske remained at Sharon so that Dr. Novero could monitor his "homicidal tendencies" and "response to medications."  (R. at 354).  Dr. Novero assigned Fiske a Global Assessment of Functioning ("GAF") rating of twenty.[7]  (R. at 353).

Fiske was discharged from inpatient care on October 8, 2009.  (R. at 510).  The next day, he attended a counseling session with Wild.  (R. at 510-511).  Although he had been instructed to

---

[6] Pennsylvania law permits any individual who has attained the age of fourteen, "believes that he [or she] is in need of treatment," and "substantially understands the nature of voluntary treatment" to submit himself or herself to inpatient treatment on a voluntary basis.  50 PA. STAT. § 7201.

[7] "The Global Assessment of Functioning ('GAF') scale, designed by the American Psychiatric Association, ranges from zero to one hundred and assesses a person's psychological, social and occupational function."  *Taliaferro v. Astrue*, 788 F.Supp.2d 412, 414, n. 2 (W.D.Pa. 2011).  A GAF rating falling between eleven and twenty is indicative of an individual who poses "some danger of hurting [himself or her]self or others," "occasionally fails to maintain minimal personal hygiene," *or* exhibits "gross impairment in communication."  American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, ("DSM-IV-TR")(4th ed. 2000), at 34.

stop using marijuana, Fiske admitted to Wild that he had "smoked marijuana once since [leaving] the hospital." (R. at 510). Wild noted that Fiske's mental condition had "improved since his hospitalization." (R. at 511).

Dr. Sharon L. Aultman, a psychiatrist affiliated with Paoletta, evaluated Fiske on October 27, 2009. (R. at 394-398). She assigned him a GAF rating of forty-eight.[8] (R. at 397). Dr. Aultman indicated that Fiske was *per se* disabled under Listings 12.04, 12.06 and 12.08. (R. at 389-392). She reported that Fiske could not tolerate interaction with members of the general public or deal with the stress associated with a usual work setting. (R. at 387). Fiske's abilities to follow work rules, relate to co-workers, interact with supervisors, use judgment, behave in an emotionally stable manner, relate predictably in social situations, demonstrate reliability, and understand, remember and carry out complex job instructions were all deemed to be "poor." (R. at 387-388).

Fiske continued to seek treatment for his mental impairments at Paoletta. He was given a GAF score of fifty-four on March 24, 2010.[9] (R. at 414, 453). Between January 11, 2010, and July 20, 2010, Fiske was assigned a GAF rating of fifty-five on four different occasions. (R. at 400, 413, 415, 451-452, 460). On September 21, 2010, he was given a GAF score of fifty-six. (R. at 450).

In order to establish his or her entitlement to benefits under the Act, a claimant must demonstrate that both his or her medically determinable impairment (or combination of impairments) and his or her inability to work have lasted (or are expected to last) for the

---

[8] A GAF score falling between forty-one and fifty is *sometimes* indicative of an individual exhibiting "serious impairment in social, occupational, or school functioning." American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, ("DSM-IV-TR")(4th ed. 2000), at 34. An individual with a GAF score in this range *may* be "unable to keep a job." *Id.*

[9] A GAF rating falling between fifty-one and sixty *may* be indicative of an individual who exhibits "moderate difficulty in social, occupational, or school functioning." American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, ("DSM-IV-TR")(4th ed. 2000), at 34. An individual with a GAF score in this range *may* experience "conflicts with peers or co-workers." *Id.*

statutory twelve-month period. *Barnhart v. Walton*, 535 U.S. 212, 214-222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002). Relying on the rapid improvement in Fiske's GAF scores, the ALJ rejected Dr. Aultman's opinion of disability on the ground that Fiske's alleged inability to work had not lasted long enough to satisfy the Act's twelve-month durational requirement. (R. at 17). The ALJ accorded "little weight" to Dr. Aultman's opinion because it had failed to account for the subsequent improvement in Fiske's condition. (R. at 17). He accorded "great weight" to Dr. Cannon's assessment. (R. at 17).

In determining the relative weight given to the opinions of Dr. Houk, Dr. Cannon and Dr. Aultman, the ALJ was required to "explain why he credited some evidence and discredited other evidence." *Reefer v. Barnhart*, 326 F.3d 376, 381 (3d Cir. 2003). Such an explanation was required to facilitate meaningful judicial review of the ALJ's factual findings. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 121 (3d Cir. 2000). Although the ALJ referred to Dr. Houk's consultative evaluation, he never explained the degree to which her examination findings were credited or rejected. (R. at 16-17). He rejected Dr. Aultman's assessment *solely* on the basis of the subsequent "improvement" in Fiske's condition. (R. at 17). The ALJ gave "great weight" to the opinion of Dr. Cannon, who had never actually examined Fiske. (R. at 17).

By precluding jobs "involving high levels of stress" and limiting Fiske to jobs requiring only "superficial interaction" with supervisors and co-workers, the ALJ generally accounted for the "moderate" to "marked" limitations referenced in Dr. Houk's examination report. (R. at 15, 47-48, 262). Nevertheless, Dr. Houk completed her evaluation *before* a deterioration in Fiske's condition necessitated inpatient treatment. In her examination report, Dr. Houk specifically remarked that Fiske had "never been psychiatrically hospitalized." (R. at 265). Dr. Cannon also rendered her opinion *before* Fiske's hospitalization. She stated that Dr. Houk had

"overestimated" some of Fiske's "social limitations." (R. at 287). The assessment provided by

Dr. Aultman was the *only* medical opinion of record postdating the deterioration in Fiske's

condition. (R. at 387-392).

The United States Court of Appeals for the Third Circuit generally looks with disfavor on

administrative decisions which reject the opinions of treating sources in favor of those expressed

by non-examining consultants. *Brownawell v. Commissioner of Social Security*, 554 F.3d 352,

357 (3d Cir. 2008). Admittedly, Dr. Aultman's assessment was based on the findings of only

one evaluation. When she rendered her opinion of disability, Dr. Aultman had not yet "obtained

a longitudinal picture" of Fiske's mental condition. 20 C.F.R. §§ 404.1527(c)(2)(i),

416.927(c)(2)(i). Nonetheless, even the opinion of a one-time examiner is ordinarily entitled to

more weight than an assessment supplied by a non-examining consultant. *McPherson v. Astrue*,

605 F.Supp.2d 744, 772 (S.D.W.Va. 2008); 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). That is

especially true when psychiatric impairments are involved. "In contrast to some physical

impairments, which can be verified or discounted solely by reference to reports of objective

medical tests, mental impairments are generally identified on the basis of a psychiatric

professional's interactions with an impaired individual." *Haisley v. Sedgwick Claims*

*Management Services, Inc.*, 776 F.Supp.2d 33, 50 (W.D.Pa. 2011). For this reason, assessments

provided by non-examining psychological consultants are often lacking in probative value.[10]

*Sheehan v. Metropolitan Life Insurance Co.*, 368 F.Supp.2d 228, 254-255 (S.D.N.Y. 2005).

Under certain circumstances, an opinion of disability provided by a treating source can be

rejected in favor of a contrary assessment supplied by a non-examining consultant. *Brown v.*

*Astrue*, 649 F.3d 193, 196-197 (3d Cir. 2011); *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir.

---

[10] This observation should not be construed as a negative reflection on Dr. Cannon's qualifications as an expert. Instead, it is simply an acknowledgement that, unlike Dr. Houk and Dr. Aultman, Dr. Cannon never had an opportunity to examine Fiske.

1991). Those circumstances, however, are not present in this case. In light of the ALJ's decision to discount Dr. Aultman's opinion on the ground that it had been rendered before the *improvement* in Fiske's condition, the ALJ was also required to account for the fact that Dr. Cannon had rendered her opinion before the *deterioration* in Fiske's condition. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)("Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason.")(internal quotation marks omitted). To the extent that the ALJ implicitly based his findings on the results of Dr. Houk's consultative evaluation, it was likewise necessary for him to consider whether her opinion was probative of Fiske's abilities and limitations for the period of time postdating his hospitalization. The drastic change in Fiske's condition triggered the ALJ's "duty to investigate further." *Reefer*, 326 F.3d at 380. The Commissioner's regulations specifically recognize that "a change in [a claimant's] condition that is likely to affect [his or her] ability to work" may necessitate a new consultative examination. 20 C.F.R. §§ 404.1519a(b)(4), 416.919a(b)(4).

The ALJ was not required to order additional testing that he did not believe to be necessary. *Kadelak v. Astrue*, 802 F.Supp.2d 934, 943-944 (N.D.Ill. 2011). Nevertheless, he was free to reject Dr. Aultman's opinion only on the basis of countervailing medical evidence. *Brownawell*, 554 F.3d at 355 (observing that "contradictory medical evidence is required for an ALJ to reject a treating physician's opinion outright"). The ALJ's decision to accord "little weight" to Dr. Aultman's assessment was grounded *solely* on the fact that Fiske's GAF scores had increased between September 2009 and September 2010. (R. at 17). Although GAF ratings may be "useful in tracking a patient's progress in global terms," they have no direct correlation with the severity requirements of Listings 12.04, 12.06 and 12.08. *Chanbunmy v. Astrue*, 560

F.Supp.2d 371, 383 (E.D.Pa. 2008). Furthermore, GAF scores are not necessarily reflective of a claimant's ability (or inability) to engage in specific work-related activities. *Jones v. Astrue*, 494 F.Supp.2d 1284, 1288 (N.D.Ala. 2007). The ALJ was not free to draw "speculative inferences from medical reports." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). As a lay adjudicator, he did not have the medical expertise to extrapolate Fiske's abilities and limitations from the treatment records provided by Paoletta. *Rivera-Torres v. Secretary of Health & Human Services*, 837 F.2d 4, 6-7 (1st Cir. 1988). In order to base a decision denying Fiske's applications for DIB and SSI benefits on an "improvement" in his condition, the ALJ was required to procure a post-improvement assessment of Fiske's work-related capacities from a medical source. *Pate-Fires v. Astrue*, 564 F.3d 935, 945-947 (8th Cir. 2009). Since the ALJ failed to consult a medical source and grounded his decision solely in speculative inferences gleaned from Fiske's GAF scores, his decision "is not supported by substantial evidence." *Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986).

The only remaining question is whether the proper remedy is an immediate award of benefits, or whether a remand for further administrative proceedings is warranted. A judicially-ordered award of benefits is proper only where "the evidentiary record has been fully developed," and where the evidence contained therein "clearly points in favor of a finding that the claimant is statutorily disabled." *Ambrosini v. Astrue*, 727 F.Supp.2d 414, 432 (W.D.Pa. 2010). That standard is not satisfied in this case.

Although the ALJ was not entitled to discount Dr. Aultman's assessment solely on the basis of the improvement in Fiske's GAF scores, the rapid changes in Fiske's condition during the fall of 2009 suggest that his ability to satisfy the Act's twelve-month durational requirement was a legitimate subject for inquiry. *Walton*, 535 U.S. at 214-222. The ALJ never explained

whether he believed Dr. Houk's opinion to be probative of Fiske's ability to work. (R. at 16-17). Nonetheless, he appeared to incorporate the "moderate" to "marked" limitations found by Dr. Houk within his residual functional capacity assessment. (R. at 15, 47-48, 262). Dr. Monaco testified that an individual with those limitations could work as a document preparer, bench assembler or cleaner. (R. at 47-48). Fiske was hospitalized roughly seven weeks after Dr. Houk's evaluation. (R. at 296, 351-354). A few weeks after Fiske's discharge from inpatient psychiatric treatment, Dr. Aultman opined that he was disabled. (R. at 387-392). The ALJ did not specifically accept or reject Dr. Aultman's assessment of Fiske's abilities and limitations as of October 27, 2009. (R. at 17). Instead, he simply determined that Fiske's condition had improved *after* that date, without relying on medical evidence to support his conclusion. (R. at 17). More than a year elapsed between the rendering of Dr. Aultman's opinion and the issuance of the ALJ's decision. (R. at 19, 388). It is certainly conceivable that Fiske's condition may have improved during the course of that year. It is also possible that Dr. Aultman may have overestimated Fiske's limitations. The Commissioner should be afforded an opportunity to reconsider the relative value of the competing medical opinions in the first instance. *Diaz v. Commissioner of Social Security*, 577 F.3d 500, 505-506 (3d Cir. 2009).

Section 105 of the Contract With America Advancement Act of 1996 ("CWAAA") amended Titles II and XVI to provide that "an individual shall not be considered to be disabled" under the Social Security Act if "alcoholism or drug addiction" would be "a contributing factor material to the Commissioner's determination that the individual is disabled." Pub. L. No. 104-121, § 105; 110 Stat. 847, 852-853 (1996); 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J). The Commissioner has promulgated regulations implementing this statutory mandate. 20 C.F.R. §§ 404.1535, 416.935. Under the applicable regulations, the dispositive question is whether a

claimant who is disabled as a result of drug or alcohol use would remain disabled if he or she were to stop using those substances. 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1). If his or her disability would persist even after a cessation of drug or alcohol abuse, he or she is entitled to an award of benefits. 20 C.F.R. §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii). Conversely, if a claimant's disability would not remain in the absence of continued drug or alcohol abuse, a finding of "materiality" is warranted, thereby requiring a denial of benefits. 20 C.F.R. §§ 404.1535(b)(2)(i), 416.935(b)(2)(i). A finding of materiality is not justified whenever competent medical sources "cannot project what limitations would remain" if the claimant were to stop using drugs or alcohol. *Salazar v. Barnhart*, 468 F.3d 615, 623 (10th Cir. 2006).

Because the ALJ concluded that Fiske was not "disabled," he never made a determination concerning the "materiality" of Fiske's substance abuse. *Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2003)(explaining that an administrative law judge must ascertain a claimant's abilities and limitations "without segregating out any effects that might be due to substance use disorders" before reaching the issue of "materiality"). Even if Fiske could conclusively establish his inability to work in this case, he would not necessarily be entitled to benefits. He testified that he typically smoked marijuana five times per week. (R. at 33-34). In her examination report, Dr. Houk described instances in which Fiske's usage of marijuana had derailed his opportunities to obtain treatment for his condition. (R. at 265). On August 13, 2009, Wild described Fiske's "addiction to marijuana" as "a primary source of many of his problems." (R. at 519). She expressed an interest in seeing "what [Fiske] would be like without the daily marijuana intake." (R. at 519). Fiske's usage of marijuana caused one of his medications to be discontinued during the course of his hospitalization. (R. at 353). After being discharged, Fiske immediately went back to smoking marijuana despite the fact that he had been instructed not to

do so.  (R. at 510).  This evidence of substance abuse would counsel against an award of benefits at this time even if, on the basis of the existing record, Fiske could otherwise establish the existence of a "disability."  Consequently, a remand for further consideration of Fiske's claims is the proper remedy in this case.  *Ambrosini*, 727 F.Supp.2d at 429-432.  Fiske should be afforded "an opportunity to be heard" on remand.  *Thomas v. Commissioner of Social Security Administration*, 625 F.3d 798, 800 (3d Cir. 2010).

## VI.  CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Commissioner's motion for summary judgment (*ECF No. 13*) be denied, and that Fiske's motion for summary judgment (*ECF No. 10*) be denied to the extent that it requests an award of benefits but granted to the extent that it seeks a vacation of the Commissioner's decision, and a remand for further proceedings.  It is further recommended that the decision of the Commissioner be vacated, and that the case be remanded to him for further consideration of Fiske's applications for DIB and SSI benefits.  In accordance with 28 U.S.C. § 636(b)(1), the parties have fourteen days to file written objections to this report and recommendation.  A party's failure to file written objections will seriously impair his ability to challenge this Court's legal conclusions on appeal.  *Brightwell v. Lehman*, 637 F.3d 187, 193, n. 7 (3d Cir. 2011).

BY THE COURT:


Dated:  August 22, 2012                    s/ Maureen P. Kelly
                                           Maureen P. Kelly
                                           United States Magistrate Judge


cc:      All counsel of record